**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>AITOFELE T.F. SUNIA<br>and TINI LAM YUEN,<br><br>Defendants. | Crim. No. 07-225<br>Judge:  Reggie B. Walton<br><br><u>Oral Argument Requested</u> |

### <u>JOINT MOTION OF AITOFELE T.F. SUNIA AND TINI LAM YUEN TO DISMISS IN WHOLE OR IN PART COUNTS ONE THROUGH SIX</u>

Pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, Aitofele T.F. Sunia and Tini Lam Yuen, through their respective counsel, move for an Order dismissing in whole or in part Counts One through Six of the Indictment.  A supporting Memorandum of Law, the exhibits thereto, and a proposed Order are being submitted with this Motion.  Mr. Sunia and Mr. Yuen respectfully request that the Court hear oral argument on this Motion.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Michelle Peterson | Lanny A. Breuer |
| Lara G. Quint | Emily Johnson Henn |
| Office of the Federal Public Defender | Covington & Burling LLP |
| 600 Indiana Ave., NW, Suite 550 | 1201 Pennsylvania Ave., NW |
| Washington, DC  20004 | Washington, DC  20004 |
| | |
| _Attorneys for Tini Lam Yuen_ | _Attorneys for Aitofele T.F. Sunia_ |

June 27, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 27th day of June, 2008, I caused a copy of the

foregoing Motion and the accompanying Memorandum of Law, exhibits thereto, and

proposed Order to be filed by Electronic Case Filing (ECF) with the U.S. District Court

for the District of Columbia.  This system caused an electronic notification and link to be

sent to the following:

| | |
|---|---|
| Michelle Peterson | Matthew L. Stennes |
| Lara G. Quint | Daniel A. Schwager |
| Office of the Federal Public Defender | Kate H. Albrecht |
| 600 Indiana Ave., NW, Suite 550 | U.S. Department of Justice |
| Washington, DC  20004 | Criminal Division, Public Integrity Section |
| | 1400 New York Ave., NW, Suite 12100 |
| | Washington, DC  20005 |

*Counsel for Tini Lam Yuen*          *Counsel for the United States*


By:  _____/s/_____
                    Emily Johnson Henn

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

AITOFELE T.F. SUNIA
and TINI LAM YUEN,

Defendants.

Crim. No. 07-225
Judge:  Reggie B. Walton

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION OF AITOFELE T.F. SUNIA AND TINI LAM YUEN TO DISMISS IN WHOLE OR IN PART COUNTS ONE THROUGH SIX

Michelle Peterson
Lara G. Quint
Office of the Federal Public Defender
600 Indiana Ave., NW, Suite 550
Washington, DC  20004

*Attorneys for Tini Lam Yuen*

Lanny A. Breuer
Emily Johnson Henn
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004

*Attorneys for Aitofele T.F. Sunia*

June 27, 2008

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    American Samoa ........................................................................... 2

    B.    Aitofele T.F. Sunia and Tini Lam Yuen ..................................... 4

    C.    The Alleged Conspiracy to Commit Fraud and Bribery (Counts One to Three).... 6

    D.    The Alleged Bribes by Mr. Yuen (Count Four) .......................... 7

    E.    The Alleged Violation of 18 U.S.C. § 1505 by Mr. Sunia (Count Five) ............... 7

    F.    The Alleged Violation of 18 U.S.C. § 1505 by Mr. Yuen (Count Six) ................. 8

ARGUMENT ....................................................................................................... 9

I.    COUNT ONE MUST BE DISMISSED BECAUSE IT IS BASED ON ACTS THAT ALLEGEDLY OCCURRED BEFORE MR. SATAUA BECAME DIRECTOR OF THE AMERICAN SAMOA DEPARTMENT OF EDUCATION ........................................................ 9

II.    COUNT TWO SHOULD BE DISMISSED BECAUSE IT IS BASED ON ACTS THAT ALLEGEDLY OCCURRED WHEN MR. SUNIA AND MR. YUEN WERE NOT "AGENTS" OF THE AS-DOE OR AS-TREASURY .................................................................................. 10

III.    COUNTS TWO AND THREE ARE TIME-BARRED BECAUSE THEY ARE BASED ON ACTS THAT ALLEGEDLY OCCURRED MORE THAN FIVE YEARS BEFORE THE INDICTMENT ............................................................................................. 13

    A.    Neither Count Two Nor Count Three Alleges a Continuing Offense .................. 14

        1.    Obtaining property by fraud in violation of § 666(a)(1)(A) is not a continuing offense .................................................................. 15

        2.    Giving bribes in violation of § 666(a)(2) is not a continuing offense ...... 17

    B.    Counts Two and Three Violate § 3282(a) Insofar as They Are Based on Acts That Allegedly Occurred More Than Five Years Before the Indictment ............. 19

IV.    COUNT FOUR SHOULD BE DISMISSED BECAUSE IT ALLEGES BRIBES THAT OCCURRED MORE THAN FIVE YEARS BEFORE THE INDICTMENT .................................................................................... 20

V.    COUNTS FIVE AND SIX SHOULD BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE ESSENTIAL ELEMENTS OF 18 U.S.C. § 1505 .................................................................................................. 21

i

A.    Mr. Sunia's and Mr. Yuen's Alleged Statements Could Not Have Had the "Natural and Probable Effect" of Obstructing the US-DOE Investigation........... 21

B.    The Indictment Does Not Allege That Mr. Sunia or Mr. Yuen Knew of or Believed that the Alleged US-DOE Investigation Was Pending When They Made Their Alleged Statements......................................................................... 25

CONCLUSION................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page**

CASES

*Banks v. Fed. Bureau of Prisons*,
No. 08-0018 (EGS), 2008 WL 2358682 (D.D.C. July 10, 2008) ...........................................24

*Dupree v. Jefferson*,
666 F.2d 606 (D.C. Cir. 1981) ........................................................................................24

*United States v. Abu-Shawish*,
507 F.3d 550 (7th Cir. 2007) .........................................................................................11

*United States v. Aguilar*,
515 U.S. 593 (1995)........................................................................................................21

*United States v. Batten*,
226 F. Supp. 492 (D.D.C. 1964) ...................................................................................25

*United States v. Beard*,
713 F. Supp. 285 (S.D. Ind. 1989) ...............................................................................27

*United States v. Byrd*,
No. 1:07CR00005, 2007 WL 2287877 (W.D. Va. Aug. 7, 2007) .........................................18

*United States v. Fruchtman*,
421 F.2d 1019 (6th Cir. 1970) .......................................................................................26

*United States v. Gatling*,
96 F.3d 1511 (D.C. Cir. 1996) .......................................................................................19

*United States v. Grace*,
429 F. Supp. 2d 1207 (D. Mont. 2006).........................................................................20

*United States v. Higgins*,
511 F. Supp. 453 (W.D. Ky. 1981)................................................................................25

*United States v. Hitt*,
249 F.3d 1010 (D.C. Cir. 2001) ...................................................................................9, 10

*United States v. Jaynes*,
75 F.3d 1493 (10th Cir. 1996) .......................................................................................15

*United States v. Kelley*,
36 F.3d 1118 (D.C. Cir. 1994) ...................................................................................25, 26

*United States v. McGoff*,
831 F.2d 1071 (D.C. Cir. 1987) ...............................................................................15, 16, 17

*United States v. Orenuga*,
   430 F.3d 1158 (D.C. Cir. 2005) ...................................................................................19

*United States v. Pease*,
   No. CR-07-757-PHX-DGC, 2008 WL 808683 (D. Ariz. Mar. 24, 2008) ........................17, 20

*United States v. Phillips*,
   219 F.3d 404 (5th Cir. 2000) ...................................................................................11, 12, 13

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006).......................................................................................22, 25

*United States v. Rivlin*,
   No. 07 Cr. 524 (SHS), 2007 WL 4276712 (S.D.N.Y. Dec. 5, 2007) .........................15, 17, 20

*United States v. Safavian*,
   451 F. Supp. 2d 232 (D.D.C. 2006) ..............................................................................22

*United States v. Schwarz*,
   283 F.3d 76 (2d Cir. 2002)............................................................................................23

*United States v. Senffner*,
   280 F.3d 755 (7th Cir. 2002) .........................................................................................22

*United States v. Toussie*,
   397 U.S. 112 (1970)............................................................................................. passim

*United States v. Vixie*,
   532 F.2d 1277 (9th Cir. 1976) .......................................................................................26

*United States v. White*,
   887 F.2d 267 (D.C. Cir. 1989) ......................................................................................19

*United States v. Wood*,
   6 F.3d 692 (10th Cir. 1993) .....................................................................................22, 23

*United States v. Yashar*,
   166 F.3d 873 (7th Cir. 1999) ..................................................................................15, 16, 19

## CONSTITUTIONS, STATUTES, AND FEDERAL RULES

Am. Samoa Rev. Const., Preamble.................................................................................3

Am. Samoa Rev. Const., art. II, § 3 ...............................................................................3

Am. Samoa Rev. Const., art. II, § 4 ...............................................................................3

Am. Samoa Rev. Const., art. II, § 20 ...........................................................................5, 13

Am. Samoa Code., tit. 2, § 2.0502 ................................................................................13

Federal Rule of Evidence 201(b) ..................................................................................23

18 U.S.C. § 201(b)(2)(A) ...............................................................................................19

18 U.S.C. § 201(c)(1) (1982) .........................................................................................19

18 U.S.C. § 371 ......................................................................................................1, 23, 24

18 U.S.C. § 641 .............................................................................................................17

18 U.S.C. § 664 ........................................................................................................15, 17

18 U.S.C. § 666 ..................................................................................................... passim

18 U.S.C. § 1503 ...........................................................................................................21

18 U.S.C. § 1505 ................................................................................................... passim

18 U.S.C. § 3282(a) .............................................................................................. passim

18 U.S.C. § 3284 ...........................................................................................................16

## OTHER AUTHORITIES

Central Intelligence Agency, The World Factbook – American Samoa,
    https://www.cia.gov/library/publications/the-world-factbook/geos/aq.html (last
    updated June 19, 2008) ............................................................................................3, 4

Sand et al., *Modern Federal Jury Instructions -- Criminal* § P 46.02 ...........................25

United States Census Bureau, State & County QuickFacts, District of Columbia,
    http://quickfacts.census.gov/qfd/states/11000.html (last updated Jan. 2, 2008)......................4

United States Department of Interior, Office of Insular Affairs, A Report on the State of
    the Islands, Chapter 2: American Samoa,
    http://www.doi.gov/oia/StateIsland/chapter2.html (last updated on Mar. 12, 2008)................4

United States Department of Interior, Office of Insular Affairs Field Office, ASG Main
    Page,
    http://www.doi.gov/oia/Islandpages/asgmain.htm (last visited June 25, 2008) .......................4

United States Department of Interior, Office of Insular Affairs, American Samoa,
    http://www.doi.gov/oia/Islandpages/asgpage.htm (last updated Apr. 29, 2008).................2, 3

Webster's II New College Dictionary (3d ed. 2005) ....................................................23

## INTRODUCTION

Aitofele T.F. Sunia and Tini Lam Yuen respectfully request that, for the reasons stated below, the Court dismiss in whole or in part Counts One through Six of the Indictment.

*First*, Count One, which alleges that Mr. Sunia and Mr. Yuen participated in a conspiracy with two officials in the Executive Branch of the American Samoa Government (the "ASG") in violation of 18 U.S.C. § 371, should be dismissed to the extent it is based on acts that purportedly occurred before January 4, 2001. By its terms, the alleged conspiracy cannot have existed until at least one of the two Executive Branch officials – Kerisiano Sili Sataua, Director of the American Samoa Department of Education (the "AS-DOE"), and Fa'au Seumanutafa, Chief Procurement Officer of the ASG's Office of Procurement – held his respective position. Prior to January 4, 2001, neither did.

*Second*, Count Two, which alleges a violation of 18 U.S.C. § 666(a)(1)(A), should be dismissed (i) as to Mr. Sunia to the extent it is based on acts that purportedly occurred while he was Counsel to the Fono (the American Samoa Legislature), and (ii) as to Mr. Yuen, in its entirety. Mr. Sunia and Mr. Yuen cannot have violated § 666(a)(1)(A) unless each was an "agent" of the Executive Branch Departments in which the alleged conduct took place. As Counsel to the Fono, Mr. Sunia was not such an agent. Likewise, as a Member of the Senate, Mr. Yuen was never such an agent.

*Third*, the five-year limitations period imposed by 18 U.S.C. § 3282(a) requires that Counts Two and Three be dismissed to the extent they are based on conduct that allegedly occurred more than five years before the Indictment was returned on September 6, 2007. These Counts allege violations of the "obtains by fraud" provision in § 666(a)(1)(A) and the bribery provision in § 666(a)(2), respectively, based on a series of discrete acts that purportedly began in

late 2000.  Neither of these offenses is a "continuing" one under *United States v. Toussie*, 397 U.S. 112 (1970).  Counts Two and Three are therefore time-barred to the extent that they are based on conduct alleged to have occurred before September 6, 2002.

*Fourth*, pursuant to § 3282(a), Count Four should be dismissed insofar as it alleges that Mr. Yuen gave bribes in violation of § 666(a)(2) between May and September 2001 and in June 2002, more than five years before the Indictment.

*Fifth*, and finally, Counts Five and Six should be dismissed for two independently sufficient reasons:  (i) the Indictment fails to allege that either Mr. Sunia or Mr. Yuen made statements that could have had the "natural and probable effect" of obstructing the alleged U.S. Department of Education ("US-DOE") investigation, and (ii) the Indictment fails to allege that Mr. Sunia or Mr. Yuen knew of or believed that the alleged US-DOE proceeding was pending when they made their alleged statements.

## BACKGROUND

### A.    American Samoa

American Samoa is a group of small Polynesian islands in the South Pacific Ocean, roughly midway between Hawaii and northeastern Australia.  US-DOI, Office of Insular Affairs, *American Samoa*, http://www.doi.gov/oia/Islandpages/asgpage.htm (last updated Apr. 29, 2008). The United Kingdom and Germany renounced their claims to the islands in the Treaty of Berlin, which was signed by those nations and the United States in 1899.  *Id.*  The following year, "the matai (chiefs) of Tutuila formally ceded the islands of Tutuila and Aunu'u to the United States," and in 1904, "the king and matai of Manu'a" did likewise with respect to "the islands of Ta'u, Ofu, Olosega, and Rose Atoll."  *Id.*

American Samoa is an "unorganized" territory, meaning that "the Congress gave plenary authority over [it] to the Secretary of the Interior, who in turn allowed American Samoans to

draft their own constitution under which their government functions."  *Id.*  The Governor of American Samoa was appointed by the U.S. Department of the Navy until 1951, and by the Secretary of the U.S. Department of the Interior (the "US-DOI") for the ensuing two-and-a-half decades.  *Id.*  No person of Samoan descent served as Governor until 1956, when Peter Tali Coleman was appointed.  In 1977, "American Samoa, for the first time, elected their own governor and lieutenant governor by popular vote."  *Id.*  To date, the federal government has continued to permit American Samoans to elect the leaders of the ASG's Executive Branch.

In 1966, the people of American Samoa established their own Constitution, after the document "ha[d] been ratified and approved by the Secretary of the Interior."  Am. Samoa Rev. Const., Preamble.  The American Samoa Constitution separates the ASG's Executive Branch from its Legislative Branch:  The provisions pertaining to the former are set forth in Article IV ("Executive Branch"); those pertaining to the latter are set forth in Article II ("The Legislature").

American Samoa's Legislature is known as the Fono.  US-DOI, Office of Insular Affairs, *American Samoa*, *supra*.  The Fono consists of a House of Representatives and a Senate.  *Id.* Members of the House of Representatives are chosen by popular vote.  *Id.*  In contrast, "[t]he Senate consists of 18 members who are chosen according to Samoan custom."  *Id.*; *see also* Am. Samoa Rev. Const. art. II, § 4 ("Senators shall be elected in accordance with Samoan custom….").  To be eligible to serve in the Senate, a person "shall . . . be the registered matai of a Samoan family who fulfills his obligations as required by Samoan custom in the county from which he is elected."  Am. Samoa Rev. Const. art. II, § 3.  The Fono convenes twice a year in sessions lasting 45 days.  US-DOI, Office of Insular Affairs, *American Samoa*, *supra*.

The total population of American Samoa is 57,496, Central Intelligence Agency, *The World Factbook – American Samoa*, https://www.cia.gov/library/publications/the-world-

factbook/geos/aq.html (last updated June 19, 2008), less than one-tenth the population of the

District of Columbia, *see* U.S. Census Bureau, *State & County QuickFacts, District of Columbia*,

http://quickfacts.census.gov/qfd/states/11000.html (last updated Jan. 2, 2008) (D.C. population

as of 2006 was 581,530).  Although the federal government provides substantial financial aid,

the Territory's economic development is "restrained by Samoa's remote location, its limited

transportation, and its devastating hurricanes."  Central Intelligence Agency, *The World

Factbook – American Samoa*, *supra*.  The airport in Honolulu, Hawaii, is the only U.S. airport

outside American Samoa with flights to the Territory, and such flights are available only on

certain days of the week.

"American Samoans are among the last remaining true Polynesians, along with the

Hawaiians, Maorians, Tongans and Tahitians."  Office of Insular Affairs, *A Report on the State

of the Islands, Chapter 2: American Samoa*, http://www.doi.gov/oia/StateIsland/chapter2.html

(last updated on Mar. 12, 2008).  Despite the influence of Western culture, "the American

Samoans, more than other Pacific Islanders, seem to hold more tenaciously to their ancient

tradition."  OIA Field Office, *ASG Main Page*, http://www.doi.gov/oia/Islandpages/asgmain.htm

(last visited June 25, 2008).  Among other things, "[t]he traditional social structure, built on the

'aiga' or extended family system remains the basis of American Samoa's social structure."  OIA,

*A Report on the State of the Islands*, *supra*.  In addition, American Samoa continues to have "a

traditional Polynesian economy in which more than 90% of the land is communally owned."

Central Intelligence Agency, *The World Factbook – American Samoa*, *supra*.

### B. Aitofele T.F. Sunia and Tini Lam Yuen

Mr. Sunia is currently the Lieutenant Governor of American Samoa.  (Indictment ¶ 8.)

According to the Indictment, Mr. Sunia served as "Counsel to the Fono from February 16, 1999

to July 9, 2001."  (*Id.* ¶ 11.)  In 1994, Mr. Sunia was "appointed [to that position] by the

President of the Senate and the Speaker of the House, to advise and assist the Legislature." Am. Samoa Rev. Const. art. II, § 20. On July 9, 2001, Mr. Sunia began serving as Treasurer. (Indictment ¶ 10.) Mr. Sunia continued in that Executive Branch position until 2003, when he was appointed Lieutenant Governor. (*Id.* ¶¶ 8, 10.) The Indictment alleges that Mr. Sunia maintained a financial and controlling interest at all relevant times in Samoa Furnishings & Handicrafts, Inc. ("SF&H"), "a furniture manufacturing company based in the village of Vaitogi, American Samoa." (*Id.* ¶ 13.) The Indictment alleges that Mr. Sunia formed the company in 1996 (*id.* ¶ 14), when he was Counsel to the Fono, as indicated above. SF&H began providing furniture to the schools operated by the AS-DOE when Mr. Sunia was serving in the Legislative Branch.

The Indictment alleges that Mr. Yuen "was first selected" for "the village of Taputimu as a territorial senator" on January 3, 2001. (*Id.* ¶ 15.) He remains a Member of the American Samoa Senate. (*Id.*) The Indictment alleges that Mr. Yuen maintained a financial and controlling interest at all relevant times in Tini P. Lam Yuen Co., Inc. ("TLY"), a company in American Samoa that makes furniture. (*Id.* ¶ 17.) Mr. Yuen allegedly "formed TLY in 1965" (*id.*) – 36 years before he joined the Fono. TLY had provided furniture to the AS-DOE's schools for decades prior to 2001.

The Indictment does not allege that the AS-DOE received furniture from SF&H or TLY other than pursuant to the Department's requests. Nor does the Indictment allege that any of the furniture that the AS-DOE ordered from SF&H or TLY was not delivered. Likewise, there is no allegation that the furniture was not of high quality.

**C.      The Alleged Conspiracy to Commit Fraud and Bribery (Counts One to Three)**

The Indictment in this case was returned on September 6, 2007.  It alleges that Mr. Sunia and Mr. Yuen participated in a conspiracy with Mr. Seumanutafa and Mr. Sataua from "late-2000" through "early-2004."  (*Id.* ¶ 26.)  Mr. Seumanutafa was the Chief Procurement Officer from January 22, 2001 to September 18, 2003.  (*Id.* ¶ 19.)  Kerisiano Sili Sataua was the Director of the AS-DOE from January 4, 2001 to August 29, 2003.  (*Id.* ¶ 18.)

The alleged purpose of the purported conspiracy was for Mr. Sunia and Mr. Yuen to enrich themselves, their relatives, and their business associates "by using their positions in the ASG and relationships with the Director of Education and Chief Procurement Officer" to obtain payments for "companies under their control" in exchange for providing furniture to the AS-DOE.  (*Id.* ¶ 27.)  As noted above, Mr. Sunia was Counsel to the Fono from February 16, 1999, until July 9, 2001, and Mr. Yuen had no government position until he "was first selected" as a member of the Fono on January 3, 2001.  (*Id.* ¶¶ 10-11, 15.)

To carry out the purported conspiracy, Mr. Sunia and Mr. Yuen allegedly "agreed with the Director of Education" (*i.e.*, Mr. Sataua) that furniture would be ordered from "companies under their control."  (*Id.* ¶ 28(a).)  The Indictment alleges that "invoices and other procurement documents" allegedly were "improperly structur[ed]" into amounts "under $10,000" to "circumvent the ASG procurement laws and avoid the competitive bidding process."  (*Id.* ¶ 28(b).)  Mr. Sataua allegedly was given bribes "to reward him for dividing up and awarding the furniture payments."  (*Id.* ¶ 28(e).)  "In or about March 2001," Mr. Sataua, Mr. Sunia, and Mr. Yuen allegedly "agreed to assign a share" of the AS-DOE's furniture projects to Mr. Seumanutafa's company in exchange for "his agreement not to enforce procurement regulations and not to open the jobs up for competitive bidding."  (*Id.* ¶¶ 28(d), 33.)

The Indictment alleges that "fraudulently structured invoices" were "prepared and submitted for payment" on 41 dates between October 2000 and December 2003.  (*Id.* ¶ 37(a)-(qq).)  The American Samoa Department of Treasury (the "AS-Treasury") allegedly was caused to make related payments on 55 dates, starting in October 2000 and ending in March 2004.  (*Id.* ¶ 39(a)-(jjj).)  For each allegedly fraudulently structured invoice cited in the Indictment, "the Director of Education, the Chief Procurement Officer, or others working at their direction[ ] prepared corresponding PRs [purchase requisitions] and POs [purchase orders] structured in the same fraudulent manner in order to circumvent the AS Procurement Regulations."  (*Id.* ¶ 38.)

### D.    The Alleged Bribes by Mr. Yuen (Count Four)

The Indictment alleges that Mr. Yuen committed three separate violations of § 666(a)(2) when he gave things of value to Mr. Sataua "in consideration for his role in awarding a share of the furniture jobs to TLY."  (*Id.* ¶¶ 42, 45-46.).  First, the Indictment alleges that, sometime between May and September 2001, Mr. Yuen directed TLY's employees "to construct and install kitchen and bathroom cabinets and counter tops" in Mr. Sataua's house.  (*Id.* ¶ 42.)  Second, the Indictment alleges that, "[i]n or about June 2002," Mr. Yuen gave $1,000 to Mr. Sataua at the Honolulu airport.  (*Id.* ¶ 45.)  Third, the Indictment alleges that Mr. Yuen gave $300 to Mr. Sataua in December 2002.  (*Id.* ¶ 46.)

### E.    The Alleged Violation of 18 U.S.C. § 1505 by Mr. Sunia (Count Five)

Count Five alleges a violation of 18 U.S.C. § 1505 based on statements that Mr. Sunia purportedly made when federal law enforcement agents from the Federal Bureau of Investigation ("FBI") and the U.S. Department of Homeland Security ("DHS") interviewed him on April 27, 2005.  (*Id.* ¶¶ 54-58.)  According to the Indictment, in August 2003, the US-DOE began an investigation into the ASG's use of federal funds.  (*Id.* ¶ 55.)  The Indictment alleges that on April 27, 2005 (at which time Mr. Sunia was Lieutenant Governor), "federal law enforcement

agents" from the FBI and the DHS conducted a "voluntary" interview of him in his office at the Executive Office Building in Pago Pago, the capital of American Samoa. (*Id.* ¶ 57.)

During the interview, Mr. Sunia allegedly "did corruptly endeavor to influence, obstruct and impede the due and proper administration of the law under which" the US-DOE investigation was pending. (*Id.* ¶ 58.) The alleged obstruction consisted of his purportedly making "false and misleading statements" to the federal law enforcement agents who interviewed him. (*Id.* ¶¶ 57-58.) Specifically, Mr. Sunia allegedly told them that (1) "his daughter ran SF&H," (2) "SF&H was doing work for the Library Services Office of the ASDOE on a 'need basis' only," and (3) "he did not intentionally keep his name off of the articles of incorporation of SF&H." (*Id.* ¶ 58.)

The Indictment does not allege that Mr. Sunia knew of or believed that as of April 27, 2005, the alleged US-DOE investigation was pending.

### F.    The Alleged Violation of 18 U.S.C. § 1505 by Mr. Yuen (Count Six)

Referencing the same US-DOE investigation discussed above, Count Six alleges a violation of 18 U.S.C. § 1505 based on statements that Mr. Yuen purportedly made during a "voluntary interview" with "federal law enforcement agents" from the FBI and the U.S. Department of Interior ("DOI") on October 21, 2004. (*Id.* ¶ 62.) The Indictment alleges that during the interview – which "took place at [Mr. Yuen's] residence in Pago Pago" – Mr. Yuen told the federal law enforcement agents that "he never gave any money to Sili Sataua and that he never gave anything of value to Sili Sataua for free." (*Id.* ¶¶ 62-63.)

The Indictment does not allege that Mr. Yuen knew of or believed that as of October 21, 2004, the alleged US-DOE investigation was pending.

<u>**ARGUMENT**</u>

I.    **COUNT ONE MUST BE DISMISSED TO THE EXTENT IT IS BASED ON ACTS THAT ALLEGEDLY OCCURRED BEFORE MR. SATAUA BECAME DIRECTOR OF THE AMERICAN SAMOA DEPARTMENT OF EDUCATION.**

The Indictment alleges that the conspiracy between Mr. Sunia, Mr. Yuen, Mr. Seumanutafa, and Mr. Satua occurred from "late-2000" through "early-2004." (*Id.* ¶ 26). Yet by the terms of the allegations in the Indictment, the conspiracy cannot have encompassed a period when neither Mr. Seumanutafa nor Mr. Sataua held their respective Executive Branch positions, and neither did until Mr. Sataua became AS-DOE Director on January 4, 2001.

The D.C. Circuit has held that "the duration of [a] conspiracy" is "determine[d]" by "the scope of the conspiratorial agreement." *United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001). "To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment." *Id.*

Here, the only alleged purpose of the purported conspiracy was for Mr. Sunia and Mr. Yuen to enrich themselves, their relatives, and their business associates "by using their positions in the ASG *and relationships with the Director of Education and Chief Procurement Officer*" to obtain payments for "companies under their control" in exchange for providing furniture to the AS-DOE. (Indictment ¶ 27 (emphasis added).) By definition, however, Mr. Sunia and Mr. Yuen had no "relationships with the Director of Education and Chief Procurement Officer" before Mr. Sataua and Mr. Seumanutafa assumed those positions – on January 4, 2001, and January 22, 2001, respectively. (*Id.* ¶¶ 18-19, 27.)

Because "the Grand Jury's plain statement of the one common goal of the conspiracy in Paragraph [27]" necessarily "confine[s]" its duration, the alleged conspiracy cannot have existed outside the "temporal limitations" imposed by that paragraph. *Hitt*, 249 F.3d at 1019-21. Thus, January 4, 2001 is the earliest date on which Mr. Sunia and Mr. Yuen could have "used their

positions in the ASG *and* relationships with the Director of Education and Chief Procurement Officer" (Indictment ¶ 27 (emphasis added)) to "act[ ] in furtherance of the alleged conspirators' common goal," *Hitt*, 249 F.3d at 1017.  Accordingly, Count One should be dismissed to the extent it is based on acts that allegedly occurred before January 4, 2001.

## II.    COUNT TWO SHOULD BE DISMISSED TO THE EXTENT IT IS BASED ON ACTS THAT ALLEGEDLY OCCURRED WHEN MR. SUNIA AND MR. YUEN WERE NOT "AGENTS" OF THE AS-DOE OR AS-TREASURY.

Count Two is based on allegations of fraudulent official acts committed by the Directors of two Executive Branch Departments of the ASG that received the requisite federal funds (the AS-DOE and the AS-Treasury) and another Executive Branch Department of the ASG that is responsible for approving the purchases made by the AS-DOE and paid for by the AS-Treasury (the Office of Procurement).  Mr. Sunia and Mr. Yuen cannot have violated § 666(a)(1)(A) unless each was an "agent" of one of these Executive Branch Departments.  As Counsel to the Legislative Branch, before July 9, 2001, Mr. Sunia was not such an agent.  As a Member of the Senate, Mr. Yuen was *never* such an agent.

Section 666(a)(1)(A) provides in relevant part that a person commits a crime when, "being *an agent* of an organization, or of a State, local, or Indian tribal government, or any agency thereof" that receives "in excess of $10,000" from the federal government "in any one-year period," he

> embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that (i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of *such* organization, government, or agency.

18 U.S.C. § 666(a)(1)(A) (emphases added).[1]

By including the word "such" immediately before "organization, government, or agency" in subsection (ii), the "plain language" of § 666(a)(1)(A) makes clear that a person cannot be convicted of violating the statute unless he is "an agent" of "the same" entity that "ha[d] custody of the funds" that he "fraudulently obtained."  *United States v. Abu-Shawish*, 507 F.3d 550, 556 (7th Cir. 2007) ("[T]he agent who is potentially criminally liable must have fraudulently obtained property that is under the care, custody, or control of the same organization for which he is an agent.").  As the Seventh Circuit recently recognized in overturning a § 666(a)(1)(A) conviction for failure to establish the "agent" element, "the very fact that the statute requires an agency relationship suggests that there is something germane about this position of trust."  *Id.*

The Fifth Circuit has similarly recognized that § 666(a)(1)(A) cannot "reach any government employee who misappropriates purely local funds, without regard to how organizationally removed the employee is from the particular agency that administers the federal program."  *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000).  "Without an agency relationship to the recipient of federal funds, § 666 does not reach the misconduct of local officials."  *Id.* at 413.  A person can be prosecuted under § 666(a)(1)(A) *only* if he is an "agent" of the particular agency that administers the federal program at issue, *i.e.*, only if he "was authorized to act on behalf of [that agency]" or "had [the] ability to control" its acts.  *Id.*

In *Phillips*, the Fifth Circuit held that, where a tax assessor was charged with fraudulently obtaining money from a federally funded parish program, he was not an "agent" within the

---

[1]    For purposes of § 666, a "State" is defined to include "any commonwealth, territory, or possession of the United States," *id.* § 666(d)(4), and "in any one-year period" is defined as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after [its] commission," *id.* § 666(d)(5).

meaning of § 666(a)(1)(a) because his duties were set by Louisiana law, and he had no authority

to act on behalf of the parish or control its acts.  *Id.* at 412-13.  The Fifth Circuit looked to "[t]he

Louisiana Constitution" and that State's statutes to determine whether the "agent" element was

satisfied, and concluded that it was not because Louisiana law "establishes assessment districts

as independent of parish government."  *Id.* at 412.

Here, the AS-DOE and AS-Treasury – both of which are "Executive [D]epartments" –

are the only "individual entities" in the ASG that allegedly received "federal assistance in excess

of $10,000" in a relevant year.  (Indictment ¶¶ 5, 7.)  The Indictment alleges that the ASG "as a

whole" received the requisite level of federal assistance, but it does *not* allege that any part of the

ASG *other than* the AS-DOE and AS-Treasury – let alone any part of the ASG outside the

Executive Branch – received any of this assistance.  (*Id.* ¶¶ 6-7.)  The Indictment does *not* allege

that the Fono received federal funds between 2000 and 2004.

Moreover, the three Executive Branch Departments identified above are the only parts of

the ASG in which the Indictment alleges that ASG officials misused their authority.  Nowhere

does the Indictment suggest that any of the alleged acts was carried out using the authority of the

Legislative Branch.  Further, the Indictment does not allege that, as Counsel to the Fono and a

Member of the Senate, respectively, Mr. Sunia and Mr. Yuen were "authorized to act on behalf

of" the AS-DOE, the AS-Treasury, or the Office of Procurement.  *Phillips*, 219 F.3d at 413.

Likewise, there is no allegation that the Counsel to the Fono or a Member of the Senate has

either the "legal authority to bind" those Executive Branch Departments or "any ability to control

or administer [those Departments'] employees . . . or funds."  *Id.*

Nor could there be any such allegation:  Under American Samoan law, neither the

Counsel to the Fono nor a Member of the Senate is authorized to act on behalf of or exercise

control over the AS-DOE, the AS-Treasury, or the Office of Procurement.  To the contrary, the

Counsel to the Fono – who is referred to as the "legislative counsel" in the American Samoa

Constitution and the relevant American Samoa statute – is authorized only to assist with the

operations of the ASG's Legislative Branch.  *See* Am. Samoa Rev. Const. Art. II, § 20 ("A

legislative counsel, who shall be learned in the law, shall be appointed by the President of the

Senate and the Speaker of the House, to advise and assist the Legislature. . . . The legislative

counsel shall also be the director of the Legislative Reference Bureau."); Am. Samoa Code tit.

2, § 2.0502 (Legislative Reference Bureau is authorized to assist with legislative matters such as

conducting research for the Legislature and helping to draft bills).  Similarly, a single Member of

the Fono lacks the authority to act on behalf of or exercise control over an Executive Branch

Department.  Nor does the Indictment allege that any of the Senate committees on which Mr.

Yuen has served possesses such authority.  (Indictment ¶ 15.)

    As a matter of American Samoa law, therefore, neither the Counsel to the Fono nor a

Member of the Senate is an "agent" of the AS-DOE, the AS-Treasury, or the Office of

Procurement within the meaning of § 666(a)(1)(A).  *See Phillips*, 219 F.3d at 412 n.12 (holding

that, because "[t]he Louisiana Constitution, as well as statute, establishes assessment districts as

independent of parish government," the tax assessor was not an "agent" under § 666(a)(1)(A)).

Accordingly, Count Two must be dismissed for failure to establish the "agent" element (i) as to

Mr. Sunia, insofar as it is based on acts that purportedly occurred while he was Counsel to the

Fono – that is, before July 9, 2001 (Indictment ¶¶ 10-11), and (ii) as to Mr. Yuen, in its entirety.

## III.    COUNTS TWO AND THREE ARE TIME-BARRED TO THE EXTENT THEY ARE BASED ON ACTS THAT ALLEGEDLY OCCURRED MORE THAN FIVE YEARS BEFORE THE INDICTMENT.

    The five-year limitations period imposed by § 3282(a) requires that Counts Two and

Three be dismissed because they are based, in part, on conduct that allegedly occurred more than

five years before the Indictment was returned on September 6, 2007.  These Counts allege

violations of the "obtains by fraud" provision in § 666(a)(1)(A) and the bribery provision in

§ 666(a)(2), respectively.  Because neither of these offenses is a "continuing" one under *United

States v. Toussie*, 397 U.S. 112 (1970), Counts Two and Three are time-barred insofar as they are

based on acts that allegedly occurred before September 6, 2002.

### A.    Neither Count Two Nor Count Three Alleges a Continuing Offense.

In § 3282(a), Congress provides: "Except as otherwise expressly provided by law, no

person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment

is found or the information is instituted within five years next after such offense shall have been

committed."  As the Supreme Court emphasized in *Toussie*, in § 3282(a), "Congress has declared

a policy that the statute of limitations should not be extended '[e]xcept as otherwise expressly

provided by law.'"  397 U.S. at 115 (quoting § 3282(a)).  This policy "protect[s] individuals

from having to defend themselves against charges when the basic facts may have become

obscured by the passage of time."  *Id.* at 114-15.

Consistent with the policy embodied in § 3282(a), the *Toussie* Court made clear that "the

doctrine of continuing offenses should be applied in only limited circumstances."  *Id.* at 115.

The Court held that an offense "should not" be deemed a "continuing" one "*unless* the explicit

language of the substantive criminal statute *compels* such a conclusion, or the nature of the crime

involved is such that Congress *must assuredly* have intended that it be treated as a continuing

one."  *Id.* (emphases added).  An exception to § 3282(a) can be made *only* when a statute

"explicitly state[s] that a certain offense will be deemed a continuing one" or contains language

"that clearly contemplates a prolonged course of conduct."  *Id.* at 120.

Moreover, under "the well-established principle of interpretation of criminal statutes

known as the rule of lenity," any doubt regarding whether a statutory violation is a continuing

offense must be resolved in favor of the accused. *United States v. McGoff*, 831 F.2d 1071, 1095 (D.C. Cir. 1987) (emphasis added). This principle was the "most important[ ]" ground for the result in *McGoff*, the leading case in the D.C. Circuit on continuing offenses. *Id.*

It is irrelevant that an Indictment charges an ongoing course of conduct that allegedly extends into the limitations period. As the D.C. Circuit explained in *McGoff*, "the term 'continuing offense' is no everyday notion with an ordinary meaning." *Id.* at 1078. To the contrary, it "is a term of art" that "is *not* the same as a scheme or pattern of illegal conduct." *United States v. Jaynes*, 75 F.3d 1493, 1506 (10th Cir. 1996) (emphasis added) (citing *McGoff*, 831 F.2d at 1078). Thus, the federal government cannot evade *Toussie* by charging "a 'continuing course of conduct' that straddles the limitations period" and insisting that "the offense [was] not completed until all criminal conduct related to [the alleged] scheme [was] exhausted." *United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999). Allowing such evasion would "eviscerate" the "narrow, selective approach" of *Toussie* and reduce the limitations period "to a function of prosecutorial discretion." *Id.* at 877, 879; *see also United States v. Rivlin*, No. 07 Cr. 524 (SHS), 2007 WL 4276712, at *2, *5 (S.D.N.Y. Dec. 5, 2007) ("[A] violation of 18 U.S.C. § 664 is not a continuing offense, regardless of how many times an individual defendant may have violated the statute or whether the defendant was engaged in an on-going course of criminal conduct.").

### 1.    Obtaining property by fraud in violation of § 666(a)(1)(A) is not a continuing offense.

Count Two charges violations of § 666(a)(1)(A) based on allegations that, on various occasions "[f]rom in or about late-2000 through early-2004," Mr. Sunia and Mr. Yuen "did obtain by fraud" payments from the ASG in connection with the AS-DOE's furniture purchases. (Indictment ¶ 49.) The alleged violations of § 666(a)(1)(A) are not a continuing offense under

*Toussie*. Indeed, this is so clear that the federal government has previously *conceded* the point. *See United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999) (the federal government agreed that a violation of § 666(a)(1)(A) is not a continuing offense "as that term is defined in *Toussie*").

*First*, § 666(a)(1)(A) contains no "explicit language" that "compels" the conclusion that such a violation is a continuing offense. *Toussie*, 397 U.S. at 115. To the contrary, nothing in § 666(a)(1)(A) suggests that the violation alleged here is a continuing offense. Thus, this is not a case where the relevant statute explicitly states that a violation is a continuing offense. *Compare id.* at 120 & n.15 (18 U.S.C. § 3284 "explicitly stated" that concealment of a bankrupt person's assets "shall be deemed a continuing offense" until certain events occur). Nor is this a case where the statutory language "clearly contemplates a prolonged course of conduct." *Id.* at 120; *compare id.* at 120 n.16 (citing as an example a statute providing for criminal prosecution of a foreign sailor who illegally "remains" in the U.S.; "the crucial word 'remains' permits no connotation other than continuing presence") (internal quotation marks omitted).

*Second*, the "nature" of fraudulently obtaining property in violation of § 666(a)(1)(A) is not such that Congress "must assuredly have intended" that it be treated as a continuing offense. *Id.* at 115, 122. Property can be fraudulently obtained from a government entity in discrete moments, without posing an ongoing "threat of the substantive evil Congress sought to prevent." *Id.* at 122. There is "nothing inherent in the act" that makes it a continuing offense. *Id.*

Moreover, fraudulently obtaining property is comparable to larceny, which the D.C. Circuit cited in *McGoff* as an example of a "typical[]" criminal offense, meaning one that is "completed as soon as each element of the crime has occurred":

> For example, a larceny is completed as soon as there has been an actual taking of the property of another without consent, with the intent permanently to deprive the owner of its use. The offense does not 'continue' over time. The crime is

16

> complete when the act is complete.  A 'continuing offense,' in contrast, is an
> unlawful course of conduct that does perdure.

*McGoff*, 831 F.2d at 1078.  As with larceny, obtaining property by fraud entails taking the

property of another with the intent of permanently depriving the owner of its use, and consent

obtained through fraud does not constitute valid consent.  In addition, both larceny and obtaining

property by fraud can occur through "instantaneous events."  *Toussie*, 397 U.S. at 122.

Courts consistently reach the same conclusion with respect to other offenses resembling

obtaining property by fraud.  One example is a recent ruling that "conversion of government

funds" in violation of the first paragraph in 18 U.S.C. § 641 – which imposes criminal liability

on one who "embezzles, steals, purloins, or knowingly converts government funds to his use" –

is not a continuing offense because "'the act of conversion is completed upon the initial

interference with the owner's interest.'"  *United States v. Pease*, No. CR-07-757-PHX-DGC,

2008 WL 808683, at *2-3 (D. Ariz. Mar. 24, 2008) (quoting *United States v. Beard*, 713 F. Supp.

285, 291 (S.D. Ind. 1989)).  Another example is a recent ruling that "embezzlement from an

employee benefit plan" in violation of 18 U.S.C. § 664 – which imposes criminal liability on

"[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts [employee

benefit plan funds] to his own use or to the use of another" – is not a continuing offense because

"[i]t is entirely possible to complete a violation of [that statute] by a single act."  *Rivlin*, 2007

WL 4276712, at *1, *3.

## 2.    Giving bribes in violation of § 666(a)(2) is not a continuing offense.

Section 666(a)(2) provides in relevant part that a person commits a crime when, if the

pertinent "State" or "agency thereof" receives "in excess of $10,000" from the federal

government "in any one-year period," he

> corruptly gives, offers, or agrees to give anything of value to any person, with
> intent to influence or reward an agent of . . . a State . . . or any agency thereof, in

17

> connection with any business, transaction, or series of transactions of such . . .
> government[ ] or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2).  Count Three charges violations of § 666(a)(2) based on allegations that,

"[f]rom in or about March 2001 through early-2004," Mr. Sunia and Mr. Yuen "did corruptly

give, offer, and agree to give the Chief Procurement Officer . . . a share of lucrative government

projects to provide furniture for the ASDOE" to reward him for "approv[ing] the continued

procurement of bookshelves and library furniture from Sunia's and Yuen's companies."

(Indictment ¶¶ 28(d), 33, 51.)

The alleged violations of § 666(a)(2) are not a continuing offense.  No "explicit

language" in the statute "compels" this conclusion, and the "nature" of corruptly giving, offering,

or giving anything of value in violation of § 666(a)(2) is not such that Congress "must assuredly

have intended" that it be treated as a continuing offense.  *Toussie*, 397 U.S. at 115, 122.  To the

contrary, Congress used words that connote "instantaneous events," *id.* at 122, *viz.*, "gives,

offers, or agrees to give," 18 U.S.C. § 666(a)(2).  Because a single act of giving, offering, or

agreeing to give a bribe thus violates the statute, there can be no argument that it "clearly

contemplates a prolonged course of conduct."  *Toussie*, 397 U.S. at 120.

Indeed, the plain language of § 666(a)(2) makes clear that a violation is complete once a

bribe is given, offered, or agreed to be given, *regardless* of when (or whether) the "business,

transaction, or series of transactions" sought to be "influence[d] or reward[ed]" occurs.  As the

federal government explained in a recent case involving an alleged violation of § 666(a)(2), "a

bribery offense is complete once the bribe is offered or solicited."  *United States v. Byrd*, No.

1:07CR00005, 2007 WL 2287877, at *2 (W.D. Va. Aug. 7, 2007).  The D.C. Circuit has reached

the same conclusion in a case involving the analogous federal bribery statute, holding that "a

bribe is consummated" in violation of 18 U.S.C. § 201(b)(2)(A) "when 'the defendant accepts

18

money with the *specific intent* of performing an official act in return.'"  *United States v. Orenuga*, 430 F.3d 1158, 1166 (D.C. Cir. 2005) (quoting *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996)) (emphasis in original).  Likewise, in an opinion by then-Judge (and now Justice) Ginsburg, the D.C. Circuit held that a violation of a materially identical gratuity statute was "completed upon the public officer's receipt or agreement to receive payments for an official act."  *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989).[2]

> **B.    Counts Two and Three Violate § 3282(a) Insofar as They Are Based on Acts That Allegedly Occurred More Than Five Years Before the Indictment.**

As the Seventh Circuit explained in *Yashar*, "for offenses that are not continuing offenses under *Toussie*, the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct."  *Yashar*, 166 F.3d at 879-80 (emphases added).  Here, Counts Two and Three charge a series of discrete, periodic violations of § 666(a)(1)(A) and § 666(a)(2) that occurred largely outside the limitations period.

Based on the Indictment, Mr. Sunia and Mr. Yuen violated § 666(a)(1)(A) each time their respective companies allegedly "obtained by fraud" property "valued at $5,000 or more" from the AS-DOE or the AS-Treasury.  18 U.S.C. § 666(a)(1)(A); (Indictment ¶ 7 (AS-DOE and AS-Treasury allegedly received the requisite level of federal funds)); *compare Rivlin*, 2007 WL 4276712, at *3 ("Based on the statutory language of 18 U.S.C. § 664, each time that Rivlin

---

[2]    The statute at issue in *White* was 18 U.S.C. § 201(c)(1) (1982), which provided in relevant part that a public official violates the statute if he "'accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for being influenced in his performance of any official act.'"

Although the issue in *White* was whether venue was proper, the D.C. Circuit used the language quoted in the text to explain the elements that are "necessary to establish the crime of bribery."  887 F.2d at 272.

received and endorsed a check from the Fund on behalf of his deceased father, the necessary

elements of [a violation of 18 U.S.C. § 664] were satisfied and the statute of limitations began to

run with respect to that violation.").  Similarly, Mr. Sunia and Mr. Yuen violated § 666(a)(2)

each time they allegedly gave Mr. Seumanutafa a "share" of the furniture projects to "influence

or reward" him with respect to the AS-DOE's purchases and the AS-Treasury's payments.

18 U.S.C. § 666(a)(2); (Indictment ¶ 33)).

Under § 3282(a), where an indictment charges an ongoing course of conduct in violation

of a federal statute that does not establish a continuing offense, the defendant cannot be

prosecuted for alleged acts outside the limitations period.  *See, e.g.*, *Pease*, 2008 WL 808683, at

*3 ("The statute of limitations therefore bars prosecution of Defendant for all violations of this

provision that occurred [more than five years before the indictment].");  *Rivlin*, 2007 WL

4276712, at *5 ("The Government may only prosecute the defendant for charged conduct that

occurred within the five years preceding the June 12, 2007 indictment.");  *United States v. Grace*,

429 F. Supp. 2d 1207, 1212, 1239 & n.30, 1243-45 (D. Mont. 2006) (the defendant could not be

prosecuted for its alleged acts more than five years before the parties entered into agreements

that tolled the limitations period until the indictment was filed).

Accordingly, Counts Two and Three should be dismissed as time barred insofar as they

charge violations of § 666(a)(1)(A) and § 666(a)(2) that allegedly were completed more than five

years before the Indictment was returned on September 6, 2007.

## IV.    COUNT FOUR SHOULD BE DISMISSED INSOFAR AS IT ALLEGES BRIBES THAT OCCURRED MORE THAN FIVE YEARS BEFORE THE INDICTMENT.

Two of the three violations of § 666(a)(2) alleged in Count Four purportedly occurred

more than five years before the Indictment:  the construction and installation by TLY employees

of kitchen and bathroom cabinets and counter tops at Mr. Sataua's house between May and

September 2001, and the alleged payment of $1,000 to Mr. Sataua by Mr. Yuen at the Honolulu airport in June 2002.  (Indictment ¶¶ 42, 45.)  Because each of these alleged bribes occurred outside the limitations period, Count Four must be dismissed to the extent it is based on them.

## V.    COUNTS FIVE AND SIX SHOULD BE DISMISSED BECAUSE THE INDICTMENT FAILS TO ALLEGE ESSENTIAL ELEMENTS OF 18 U.S.C. § 1505.

Count Five alleges that Mr. Sunia made "false and misleading statements" in violation of 18 U.S.C. § 1505 during a voluntary interview with federal law enforcement agents on April 27, 2005.  (*Id.* ¶¶ 54-58.)  Count Six alleges that Mr. Yuen did likewise during a voluntary interview with federal law enforcement agents on October 21, 2004.  (*Id.* ¶¶ 59-63.)  Each of these Counts should be dismissed for two separate and independent reasons: (1) as a matter of law, the alleged statements cannot have had the "natural and probable effect" of interfering with the US-DOE's investigation; and (2) the Indictment fails to allege that Mr. Sunia or Mr. Yuen knew of or believed that the alleged US-DOE proceeding was pending when they made their alleged statements.

### A.    Mr. Sunia's and Mr. Yuen's Alleged Statements Could Not Have Had the "Natural and Probable Effect" of Obstructing the US-DOE Investigation.

To support a charge under § 1505, the federal government must allege not only that Mr. Sunia and Mr. Yuen "utter[ed] false statements to . . . investigating agent[s]," but also that there was a "nexus" between those statements and the proceeding they allegedly obstructed.  *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).  The federal government can satisfy this "nexus" requirement only if its allegations demonstrate "a relationship in time, causation, or logic" with the relevant proceeding, such that Mr. Sunia's and Mr. Yuen's statements "must have

[had] the 'natural and probable effect' of interfering with" that proceeding.  *Id.* at 599 (quoting *United States v. Wood*, 6 F.3d 692, 696 (10th Cir. 1993)).[3]

The case on which the *Aguilar* Court relied for these principles – the Tenth Circuit's decision in *Wood* – demonstrates that the Indictment fails to allege the requisite "nexus" between either Mr. Sunia's or Mr. Yuen's alleged statements and the US-DOE's investigation.  *Wood* involved allegations strikingly similar to those here.  The defendant was charged with obstruction of justice for lying to FBI agents, who interviewed him "in his own office" in connection with a grand jury investigation.  *Wood*, 6 F.3d at 693, 697.  During the "unsworn" interview, the defendant allegedly told the agents several lies about his conduct that related to a pending corruption investigation.  *Id*. at 693-94.  The Tenth Circuit held, as a matter of law, that the alleged statements could not support an obstruction of justice charge, explaining that it was "difficult to believe that the FBI agents would terminate their investigation based on the self-serving exculpatory explanation offered by defendant."  *Id.* at 696.  Moreover, "[t]hat the investigation eventually revealed what the government claims is the truth about [defendant's actual conduct] is evidence that they did not rely exclusively on defendant's statements."  *Id.* at 696-97.

As in *Wood*, here Mr. Sunia's alleged voluntary, "unsworn" statements "given in his own office" to federal law enforcement agents cannot have had the "natural and probable effect of

---

[3]    Although *Aguilar* and *Wood* involved prosecutions under 18 U.S.C. § 1503, the same "nexus" requirement applies under 18 U.S.C. § 1505.  *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 174 (2d Cir. 2006) (citing *Aguilar* in holding that § 1505 "includ[es] the judicially grafted nexus requirement"); *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002) (citing *Aguilar* in holding that § 1505 requires government to show that defendant's statements "had the 'natural and probable' effect of interfering" with proceeding); *United States v. Safavian*, 451 F. Supp. 2d 232, 248 (D.D.C. 2006) (§ 1505 conviction requires that defendant's conduct had "'natural and probable effect' of interfering with the due administration of justice").

impeding the due administration of justice." *Id*. at 697. The same is true with respect to the statements allegedly made by Mr. Yuen to the federal law enforcement agents who interviewed him at his residence. Indeed, the Indictment does not allege that any of the statements allegedly made by Mr. Sunia and Mr. Yuen impeded the US-DOE's investigation in any way. *Compare id.* at 696 (citing absence of allegation that agents who interviewed defendant "rel[ied] exclusively on [his] statements" and considered "terminat[ing]" their work as a result); *see also United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002) (reversing conviction of defendant who "lied to federal investigators regarding issues pertinent to the grand jury's investigation" because prosecutors failed to establish that his statements were conveyed to the grand jury).

Furthermore, given the nature of Mr. Sunia's and Mr. Yuen's alleged statements and the contexts in which they were made, they cannot, as a matter of law, have had the "natural and probable effect" of interfering with the US-DOE's investigation. To begin with, the allegations in the Indictment do not demonstrate that Mr. Sunia's first alleged statement – that "his daughter ran SF&H" (Indictment ¶ 58) – was false. The term "ran" can be used to mean at least 60 different things. *See Webster's II New College Dictionary* 992 (3d ed. 2005) (defining "to run"). Even the meaning one might *guess* is intended – "control[led], manage[d], or direct[ed]," *id*. – is ambiguous here: Mr. Sunia's daughter could have "managed" SF&H while someone else "controlled" it. More fundamentally, the Indictment fails to allege that anyone relied on Mr. Sunia's purported statement that "his daughter ran SF&H," let alone to establish how this statement could have "imped[ed]" an investigation that began nearly two years earlier and had already resulted in multiple prosecutions.[4] *Wood*, 6 F.3d at 696-97.

---

[4]    On April 13, 2004 and December 20, 2004, respectively, Mr. Seumanutafa and Mr. Sataua were each charged with one count of violating § 371 based on allegations of federal (continued…)

The same is true for the second and third alleged statements by Mr. Sunia.  The Indictment fails to allege how anyone might have been misled by the purported statement that "SF&H was doing work for the Library Services Office of the ASDOE on a 'need basis' only." (Indictment ¶ 58.)  If understood to mean that the AS-DOE ordered only furniture that was needed, no allegation in the Indictment contradicts this statement.  Likewise, Mr. Sunia's alleged statement that "he did not intentionally keep his name off of the articles of incorporation of SF&H" (*id.*) cannot support a § 1505 conviction.  It is unclear how someone could *unintentionally* keep his name off of a company's incorporation documents, and, again, such a vague statement cannot have had the effect of impeding a two-year-old investigation that had already resulted in multiple prosecutions related to the conduct alleged in the Indictment.

Finally, the Indictment fails to allege facts showing how any federal law enforcement agent could have been misled by Mr. Yuen's alleged statements that "he never gave any money to Sili Sataua" and that "he never gave anything of value to Sili Sataua for free."  (*Id.* ¶ 63.)  The federal government makes no such allegation because it cannot:  Shortly after Mr. Yuen allegedly made these statements, it charged Mr. Sataua with violating § 371 based on alleged overt acts that included "accept[ing] $1,000" and "construction work on his personal residence from Coconspirator Two in exchange for [Mr. Sataua] awarding certain AS-DOE contracts to Coconspirator Two's company."  (Ex. 2, Sataua Information ¶ 18(a)-(b).)

---

programs fraud and bribery similar to those here.  (Seumanutafa Information (Ex. 1); Sataua Information (Ex. 2)).  These charging documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b) – *viz.*, the District of Hawaii's official court records – and are thus subject to judicial notice, *see, e.g.*, *Dupree v. Jefferson*, 666 F.2d 606, 608 n. 1 (D.C. Cir. 1981) (court has "authority to judicially notice related proceedings in other courts"); *Banks v. Fed. Bureau of Prisons*, No. 08-0018 (EGS), 2008 WL 2358682, at *1 (D.D.C. July 10, 2008) ("The Court takes judicial notice of the records of this Court and of other federal district courts.").

**B.**    **The Indictment Does Not Allege That Mr. Sunia or Mr. Yuen Knew of or Believed that the Alleged US-DOE Investigation Was Pending When They Made Their Alleged Statements.**

To properly allege that Mr. Sunia and Mr. Yuen violated § 1505, the government must allege the following legal elements:  that a "proceeding [was] pending before a department or agency of the United States," and that Mr. Sunia and Mr. Yuen "knew of or believed that the proceeding was pending."  *See Quattrone*, 441 F.3d at 174 (alterations omitted); *see also* Hon. Leonard B. Sand et al., *Modern Federal Jury Instructions -- Criminal* § P 46.02, Form Instruction 46-9 (2007).  Not every agency or department investigation qualifies as a "proceeding" under the statute, however.  As the D.C. Circuit has explained, "[f]or an investigation to be considered a proceeding [under § 1505] . . . it must be more than a 'mere police investigation.'"  *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (quoting *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964)); *see also United States v. Higgins*, 511 F. Supp. 453, 455 (W.D. Ky. 1981) (dismissing indictment charging violation of 18 U.S.C. § 1505 because an FBI investigation is not a "proceeding" under § 1505) (cited approvingly in *Kelley*).  The reason that "mere" police investigations are not "proceedings" under the statute is that law enforcement agencies do not typically possess "rulemaking" or "adjudicative" power over the subject matter of an indictment.  *See Kelley*, 36 F.3d at 1127 (citing *Higgins*, 511 F. Supp. 453).  As the court explained in *Higgins*:

> [T]he meaning of 'proceeding' in [18 U.S.C. §] 1505 must be limited to actions of an agency *which relate to some matter within the scope of the rulemaking or adjudicative power vested in the agency by law*.  Since the F.B.I. has no rulemaking or adjudicative powers regarding the subject matter of this indictment, its investigation was not a "proceeding" within the meaning of [§ 1505].

*Higgins*, 511 F. Supp. at 455 (emphasis added).  The quintessential § 1505 proceeding, therefore, is an investigation by an agency into activities within that agency's purview.  Thus, for example,

25

courts have found investigations into tax violations by the Internal Revenue Service or into price

discrimination by the Federal Trade Commission to constitute "proceedings" for purposes of

Section 1505. *See, e.g., United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976); *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970).

With these principles in mind, the "proceeding" that Mr. Sunia and Mr. Yuen

must have been alleged to "know of or believe[] . . . was pending" is the US-DOE investigation.

Indeed, the US-DOE investigation is the only proceeding that they are alleged specifically to

have obstructed. (Indictment ¶¶ 58, 63.) The Indictment is defective, however, because it fails

to allege that Mr. Sunia or Mr. Yuen knew of or believed that the alleged US-DOE investigation

was pending when they made their alleged statements.

In addition, the Indictment alleges merely that Mr. Sunia and Mr. Yuen were

interviewed by "federal law enforcement agents" -- from the FBI and the DHS in Mr. Sunia's

case and from the FBI and the DOI in Mr. Yuen's case. (*Id.* ¶¶ 57, 62.) Nowhere does it allege

that either Mr. Sunia or Mr. Yuen knew of or believed that anything more than a "mere police

investigation" was pending. This is insufficient as a matter of law. *See Kelley*, 36 F.3d at 1127.

In sum, because the Indictment does not allege that Mr. Sunia or Mr. Yuen knew

of or believed that the alleged US-DOE proceeding was pending when they made their alleged

statements, Counts Five and Six should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should: (i) dismiss Count One to the extent it is

based on acts that allegedly occurred before January 4, 2001; (ii) dismiss Count Two for failure

to allege the "agent" element as to Mr. Sunia to the extent it is based on acts before July 9, 2001

and as to Mr. Yuen in its entirety; (iii) dismiss Counts Two through Four as time-barred to the

extent they are based on conduct that allegedly occurred before September 6, 2002; and

(iv) dismiss Counts Five and Six because they fail to allege essential elements of 18 U.S.C. § 1505.

Respectfully submitted,


_____/s/_____                    _____/s/_____
Michelle Peterson                           Lanny A. Breuer
Lara G. Quint                               Emily Johnson Henn
Office of the Federal Public Defender       Covington & Burling LLP
600 Indiana Ave., NW, Suite 550             1201 Pennsylvania Ave., NW
Washington, DC  20004                       Washington, DC  20004

*Attorneys for Tini Lam Yuen*                 *Attorneys for Aitofele T.F. Sunia*


June 27, 2008

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 1 5 2004

at ____ o'clock and ____ min. ____ M.
WALTER A.Y.H. CHINN, CLERK

EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

NOEL L. HILLMAN
Chief
U.S. Department of Justice
Public Integrity Section
Criminal Division

James A. Crowell IV
Trial Attorney
U.S. Department of Justice
Public Integrity Section
Criminal Division
10th & Constitution Ave, NW
Washington, DC 20530
Telephone:  (202) 514-2271
Facsimile:  (202) 514-3003
Email: james.crowell@usdoj.gov

Attorneys for
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. CR 04-00162 DAE |
| ) | |
| Plaintiff, ) | INFORMATION |
| ) | |
| vs. ) | 18 U.S.C. § 371 |
| ) | |
| FA'AU SEUMANUTAFA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

INFORMATION

The United States charges that:

<u>COUNT ONE</u>
Conspiracy
18 U.S.C. § 371

At all relevant times to this Information:

1.    Defendant, FA'AU SEUMANUTAFA, was employed as an official of the United States Territory of American Samoa, serving as the Chief Procurement Officer ("CPO") for the American Samoa Office of Procurement and responsible for all purchases by the Government of American Samoa performed through its Office of Procurement.

2.    Defendant FA'AU SEUMANUTAFA in his capacity as CPO approved or directed others to approve all purchases by the American Samoa Government performed by or through the American Samoa Office of Procurement, including the American Samoa Department of Education ("Education Department") and Department of Human and Social Services ("Social Services Department").

3.    Defendant FA'AU SEUMANUTAFA submitted or directed others to submit all American Samoa Office of Procurement purchase orders and vouchers for payment to the American Samoa Department of Treasury.  All payments for said vouchers were paid for with American Samoa Department of Treasury funds including certain funds provided by the United States Department of Education and the United States Department of the Interior.

2

4.    American Samoa acquisition rules for the Office of Procurement required that all contracts valued at more than $10,000 must be put out for competitive bid.

5.    SAMOA WOOD PRODUCTS was a partnership formed in the United States Territory of American Samoa, and controlled and operated by Defendant FA'AU SEUMANUTAFA.

6.    During each of the periods October 1, 2001, through September 30, 2002, and October 1, 2002, through September 30, 2003, the United States Department of Education provided in excess of $21,000,000 to the Education Department for the acquisition of educational products and for building repair and maintenance of school buildings in American Samoa. These grant funds were deposited in the accounts of the American Samoa Department of Treasury for said acquisitions and repair.

7.    During this period, the United States Department of Interior annually provided in excess of $200,000,000 to the Government of American Samoa to support federal programs operated in American Samoa. These grant funds were deposited in the accounts of the American Samoa Department of Treasury.

### THE CONSPIRACY

8.    Beginning in or about February 1, 2001 and continuing until approximately September 18, 2003, in the District of Hawaii and elsewhere, Defendant FA'AU SEUMANUTAFA and others known and unknown to the United States did unlawfully

3

combine, conspire, confederate, and agree together and with each
other to commit offenses against the United States, that is:

      a.   to devise a scheme and artifice to defraud
the Government of American Samoa and to obtain its money and
property by means of materially false and fraudulent pretenses
and representations, and to deprive the Government of American
Samoa of its intangible right to Defendant FA'AU SEUMANUTAFA's
honest services, and for the purposes of executing such scheme,
and attempting to do so, placed and caused to be placed in a post
office and authorized depository for mail matter to be sent and
delivered by the United States Postal Service, and to deposit and
cause to be deposited matter to be sent and delivered by a
private and common interstate carrier, in violation of Title 18,
United States Code, Sections 1341 and 1346; and

      b.   being an agent of a government of a territory
and possession of the United States, which government received
federal assistance in excess of $10,000 in a one-year period, to
embezzle, steal, obtain by fraud, and without authority knowingly
convert to the use of a person not the rightful owner and
intentionally misapply, property, valued at least $5,000, owned
by, under the care, custody and control of the Government of
American Samoa, in violation of Title 18, United States Code,
Section 666(a)(1)(A).

## OBJECT OF THE CONSPIRACY

9.   It was the object of the conspiracy that Defendant FA'AU SEUMANUTAFA and his coconspirators enrich themselves by obtaining monies from the Government of American Samoa by means of fraudulent purchase requisitions, purchase orders, approvals, and receiving reports, and to conceal the purpose of the conspiracy and the acts committed in furtherance of it.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which Defendant FA'AU SEUMANUTAFA and his coconspirators sought to accomplish the conspiracy, included, among other things, the following:

10.   Defendant FA'AU SEUMANUTAFA and his coconspirators would and did agree to divide several Education Department contracts to provide bookshelves and library furniture to American Samoa schools amongst several companies, including SAMOA WOOD PRODUCTS.

11.   Defendant FA'AU SEUMANUTAFA and his coconspirators would and did agree to pre-set the prices that would be charged on Education Department contracts even though American Samoa government acquisition rules required all said contracts be put out for competitive bid.

12.   Defendant FA'AU SEUMANUTAFA and his coconspirators would and did subdivide the purchase orders for said contracts into numerous purchase orders below $10,000 in order to allow

5

Defendant FA'AU SEUMANUTAFA, in his official capacity as CPO, to approve payment of the purchase orders.

13. Defendant FA'AU SEUMANUTAFA and his coconspirators would and did submit false invoices and purchase requests for bookshelves and furniture that were never delivered to the Education Department school system for which Defendant FA'AU SEUMANUTAFA and his coconspirators received large monetary payments from the American Samoa Department of Treasury's accounts with the Bank of Hawaii.

14. Defendant FA'AU SEUMANUTAFA falsified and directed others to falsify numerous Office of Procurement Receiving Reports showing that bookshelves had been received, knowing full well that not all of the bookshelves had been nor would ever be delivered.

15. Defendant FA'AU SEUMANUTAFA and his coconspirators would and did bypass the delivery verification requirement that the bookshelves and furniture be sent through the Office of Procurement.

16. Defendant FA'AU SEUMANUTAFA would and did provide money and other things of value to American Samoa government officials to facilitate the processing of the contracts for bookshelves and library furniture.

17. Defendant FA'AU SEUMANUTAFA and his coconspirators

would and did agree to award to SAMOA WOOD PRODUCTS several
Social Services Department contracts to construct and repair
certain government buildings in exchange for Defendant FA'AU
SEUMANUTAFA providing money and other things of value to his
coconspirators.

18.  Defendant FA'AU SEUMANUTAFA would and did set the
prices that would be charged on said Social Services contracts
below $10,000 in order to allow Defendant FA'AU SEUMANUTAFA, in
his official capacity as CPO, to approve payment of the purchase
orders.

## OVERT ACTS

19.  In furtherance of the conspiracy and in order to
accomplish its objects, the following overt acts, among others,
were committed by one or more of the conspirators in the District
of Hawaii and elsewhere:

a.   On or about November 6, 2001, in Pago Pago
American Samoa, Defendant FA'AU SEUMANUTAFA approved and
submitted for payment Purchase Order 15066 for $7,520, payable to
SAMOA WOOD PRODUCTS.

b.   On or about March 5, 2002, in Pago Pago,
American Samoa, Defendant FA'AU SEUMANUTAFA approved and
submitted for payment Purchase Order 15953 for $8,225.

c.    On or about April 14, 2003, in Pago Pago, American Samoa, Defendant FA'AU SEUMANUTAFA approved and submitted for payment Purchase Order 19862 for $8,225.

d.    On or about March 2002, in Pago Pago, American Samoa, Defendant FA'AU SEUMANUTAFA altered Purchase Orders 16519, 15953, 16515, 15971, 15972, 16520, 16518, and 15979, by crossing out the company requesting payment and replacing it with SAMOA WOOD PRODUCTS. Defendant FA'AU SEUMANUTAFA then approved and submitted for payment these purchase orders.

e.    On or about March 2002, in Pago Pago, American Samoa, Defendant FA'AU SEUMANUTAFA paid $2,000 to a coconspirator via check drawn on the ANZ Bank in Pago Pago, American Samoa account for SAMOA WOOD PRODUCTS in exchange for his coconspirator's help in facilitating the bookshelf scheme.

f.    On or about March 20, 2002, Check No. 402081 in the amount of $28,200 was issued by the American Samoa Department of Treasury from its account with the Bank of Hawaii to SAMOA WOOD PRODUCTS for payment for false invoices submitted and/or approved by Defendant FA'AU SEUMANUTAFA.

g.    On or about May 10, 2002, Check No. 409029 in the amount of $28,200 was issued by the American Samoa Department of Treasury from its account with the Bank of Hawaii to SAMOA

WOOD PRODUCTS for payment for false invoices submitted and/or approved by Defendant FA'AU SEUMANUTAFA.

      h.  On or about April 15, 2003, Check No. 427781 in the amount of $28,200 was issued by the American Samoa Department of Treasury from its account with the Bank of Hawaii to SAMOA WOOD PRODUCTS for payment for false invoices submitted and/or approved by Defendant FA'AU SEUMANUTAFA.

      i.  Defendant FA'AU SEUMANUTAFA wrote and directed others to write numerous checks drawn on the SAMOA WOOD PRODUCTS bank account with ANZ Bank in Pago Pago, American Samoa and caused these checks to be sent by U.S. mail from American Samoa to Honolulu, Hawaii for deposit in Defendant FA'AU SEUMANUTAFA's personal checking and savings accounts at the Bank of Hawaii.

      j.  During the period February 2001 through September 2003, Defendant FA'AU SEUMANUTAFA and his coconspirators made and caused to be made by means of the United States mail the delivery of false purchase orders for SAMOA WOOD PRODUCTS totaling at least $80,000 to the Government of American Samoa in Pago Pago, American Samoa in furtherance of the aforesaid conspiracy.

      k.  On or about July 1, 2002, Defendant FA'AU SEUMANUTAFA wrote and directed others to write checks totaling approximately $5,000 to an American Samoa government official in

payment for facilitating the award of a Social Services

Department construction contract to SAMOA WOOD PRODUCTS.  Said

checks were drawn on SAMOA WOOD PRODUCTS' account with ANZ Bank

in Pago Pago, American Samoa.

All in violation of Title 18, United States Code, Section

371.


DATED: April 13 , 2004, at Honolulu, Hawaii.


              EDWARD H. KUBO, JR.
              United States Attorney
              District of Hawaii



              NOEL L. HILLMAN
              Chief, Public Integrity Section
              JAMES A. CROWELL IV
              Trial Attorney
              U.S. Department of Justice
              Criminal Division
              Public Integrity Section
              10th & Constitution Ave., NW
              Washington, DC 20530



UNITED STATES v. SEUMANUTAFA; Cr. No. _____;
"INFORMATION"

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 21 2004

at _____ o'clock and ____ min. ___ M.
WALTER A. Y. H. CHINN, CLERK

EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

NOEL L. HILLMAN
Chief
U.S. Department of Justice
Public Integrity Section
Criminal Division

James A. Crowell IV
Trial Attorney
U.S. Department of Justice
Public Integrity Section
Criminal Division
10th & Constitution Ave, NW
Washington, DC 20530
Telephone:  (202) 514-2271
Facsimile:  (202) 514-3003
Email: james.crowell@usdoj.gov

Attorneys for
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. CR04-00478 DAE |
| | ) | |
| Plaintiff, | ) | INFORMATION |
| | ) | |
| vs. | ) | 18 U.S.C. § 371 |
| | ) | |
| KERISIANO SILI SATAUA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

INFORMATION

The United States charges that:

<u>COUNT ONE</u>
Conspiracy
18 U.S.C. § 371

At all relevant times to this Information:

1.    Defendant KERISIANO SILI SATAUA was employed as an official of the United States Territory of American Samoa, serving as the Director of the American Samoa Department of Education ("AS-DOE") and responsible for the management and operation of the American Samoa School System.

2.    Defendant KERISIANO SILI SATAUA in his capacity as Director controlled and managed the awarding of all AS-DOE contracts, directed the allocation of AS-DOE and United States Department of Education ("US-DOE") funds for AS-DOE programs, and was responsible for the expenditure of all AS-DOE and US-DOE funds in American Samoa.

3.    Defendant KERISIANO SILI SATAUA submitted or directed others to submit invoices and purchase requests for payment under AS-DOE contracts for payment to the American Samoa Department of Treasury.  All payments for said vouchers were paid for with American Samoa Department of Treasury funds from its accounts with the Bank of Hawaii including certain funds provided by the United States Departments of Agriculture, Education, and Interior and other federal agencies.

4.   AS-DOE procurement regulations require that all contracts for goods and services for more than $10,000 be awarded by competitive bid and not sole-sourced to preferred vendors.

5.   SAMOA WOOD PRODUCTS was a partnership formed in the United States Territory of American Samoa, and controlled and operated by one of the Defendant's coconspirators.

6.   Defendant KERISIANO SILI SATAUA in his capacity as Director was also responsible for the management and distribution of food and goods purchased for the American Samoa Department of Education School Lunch Program ("A.S. School Lunch Program") which were intended to be used for feeding children in the American Samoa Public School System.

7.   All food and goods distributed by the A.S. School Lunch Program were paid for in significant part with funds from the United States Department of Agriculture ("USDA") National School Lunch Program ("U.S. School Lunch Program") and the US-DOE.

8.   U.S. School Lunch Program regulations required that all food and goods purchased through the A.S. School Lunch Program be used for feeding children in the American Samoa Public School System.

3

9.    During each of the periods October 1, 1998 through September 30, 1999; October 1, 1999 through September 30, 2000; October 1, 2000 through September 30, 2001; October 1, 2001 through September 30, 2002; October 1, 2002 through September 30, 2003, the US-DOE provided in excess of $10,000,000 to the AS-DOE to support educational programs in American Samoa, including the procurement of bookshelves, student desks, library furniture, laboratory benches, school bus repairs, and industrial storage containers, and funding the A.S. School Lunch Program.  These grant funds were deposited in the American Samoa Department of Treasury's accounts with the Bank of Hawaii in Pago Pago, American Samoa.

10.    During the period October 1, 2002 through September 30, 2003, the USDA provided in excess of $11,000,000 to the A.S. School Lunch Program.  These grant funds were deposited in the American Samoa Department of Treasury's accounts with the Bank of Hawaii in Pago Pago, American Samoa.

4

## THE CONSPIRACY AND ITS OBJECTS

11.  Beginning in or about June 1999, and continuing
until approximately July 2003, in Honolulu, Hawaii and elsewhere,
Defendant KERISIANO SILI SATAUA and others known and unknown to
the United States did unlawfully combine, conspire, confederate,
and agree together and with each other to commit offenses against
the United States, that is:

a.   being an agent of the Government of
American Samoa, a government of a territory and possession of the
United States which received federal assistance in excess of
$10,000 in a one-year period, to corruptly solicit and demand for
the benefit of a person, and accept and agree to accept, a thing
of value from a person, intending to be influenced and rewarded
in connection with a business, transaction, and series of
transactions of the Government of American Samoa involving a
thing of value of $5,000 or more, in violation of Title 18,
United States Code, Section 666(a)(1)(B); and

b.   being an agent of the Government of
American Samoa, a government of a territory and possession of the
United States which received federal assistance in excess of
$10,000 in a one-year period, to embezzle, steal, obtain by
fraud, and without authority knowingly convert to the use of a

5

person not the rightful owner and intentionally misapply,
property, valued at least $5,000, owned by, under the care,
custody and control of the Government of American Samoa, in
violation of Title 18, United States Code, Section 666(a)(1)(A).

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which Defendant KERISIANO SILI
SATAUA and his coconspirators sought to accomplish the
conspiracy, included, among other things, the following:

12.   Defendant KERISIANO SILI SATAUA and his
coconspirators would and did agree that the Defendant in exchange
for money and other things of value would by-pass AS-DOE
procurement regulations and award or direct others to award
certain AS-DOE contracts for bookshelves, student desks, library
furniture, laboratory benches, school bus repairs, and industrial
storage containers to his coconspirators and their companies,
including SAMOA WOOD PRODUCTS.

13.   Defendant KERISIANO SILI SATAUA and his
coconspirators would and did pre-set the prices charged on
certain AS-DOE contracts even though American Samoa government
acquisition rules required all said contracts be put out for
competitive bid.

6

14. Defendant KERISIANO SILI SATAUA and his coconspirators would and did subdivide the purchase orders for said contracts into numerous purchase orders below $10,000 in order to allow the Defendant, in his official capacity as Director, to approve or direct others to approve the payment of the purchase orders.

15. Defendant KERISIANO SILI SATAUA's coconspirators submitted false invoices and purchase requests for payment under the AS-DOE contracts for which they received large monetary payments from the American Samoa Department of Treasury's accounts with the Bank of Hawaii, which were paid out of funds provided in substantial part by the US-DOE and other federal agencies.

16. Defendant KERISIANO SILI SATAUA and his coconspirators would and did agree to use the Defendant's official position as Director to take food from the A.S. School Lunch Program for their personal use.

17. Defendant KERISIANO SILI SATAUA would and did direct his employees to use A.S. School Lunch food, goods, and funds for the purchase of a vehicle and to pay for conferences, seminars, and a funeral. The food, goods, and funds were paid for with USDA and US-DOE funds.

7

## OVERT ACTS

18.   In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by one or more of the conspirators in the District of Hawaii and elsewhere:

a.   In or about 2000, in Honolulu, Hawaii, Defendant KERISIANO SILI SATAUA accepted $1,000 in United States currency from Coconspirator Two in exchange for Defendant KERISIANO SILI SATAUA awarding certain AS-DOE contracts to Coconspirator Two's company.

b.   In or about 2000, in Pago Pago, American Samoa, Defendant KERISIANO SILI SATAUA accepted $3,000 worth of construction work on his personal residence from Coconspirator Two in exchange for Defendant KERISIANO SILI SATAUA awarding certain AS-DOE contracts to Coconspirator Two's company.

c.   In or about 2000, in Pago Pago, American Samoa, Defendant KERISIANO SILI SATAUA accepted a $3,000 check from Coconspirator One drawn on his personal account with ANZ Bank in exchange for Defendant KERISIANO SILI SATAUA awarding certain AS-DOE contracts to SAMOA WOOD PRODUCTS.

8

d.    In or about 2001, in Pago Pago, American Samoa, Defendant KERISIANO SILI SATAUA accepted $2,000 in United States currency from Coconspirator One in exchange for Defendant KERISIANO SILI SATAUA awarding certain AS-DOE contracts to SAMOA WOOD PRODUCTS.

e.    In or about November 2001, in Pago Pago American Samoa, Defendant KERISIANO SILI SATAUA approved for payment Purchase Order 15066 for $7,520, payable to SAMOA WOOD PRODUCTS.

f.    In or about March 2002, in Pago Pago, American Samoa, Defendant KERISIANO SILI SATAUA approved for payment Purchase Orders 16519, 15953, 16515, 15971, 15972, 16520, 16518, and 15979, payable to SAMOA WOOD PRODUCTS.

g.    On or about March 20, 2002, Check No. 402081 in the amount of $28,200 was issued by the American Samoa Department of Treasury from its account with the Bank of Hawaii to SAMOA WOOD PRODUCTS for payment for false invoices approved by Defendant KERISIANO SILI SATAUA.

h.    In or about March 2003, Defendant KERISIANO SILI SATAUA knowingly approved or directed others to approve fraudulent requests for food and goods from the A.S. School Lunch Program warehouse, knowing full well that such food and goods were being diverted for a funeral.

i.    In or about 2002, Defendant KERISIANO SILI SATAUA knowingly took food and goods from the A.S. School Lunch Program warehouse and converted them to his personal use.

**All in violation of Title 18, United States Code, Section 371.**

DATED: December 20, 2004, at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

NOEL L. HILLMAN
Chief, Public Integrity Section

JAMES A. CROWELL IV
Trial Attorney
U.S. Department of Justice
Criminal Division
Public Integrity Section
10th & Constitution Ave., NW
Washington, DC  20530

UNITED STATES v. SATAUA; Cr. No._____ _____;
"INFORMATION"

10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br><br>v.<br><br>AITOFELE T.F. SUNIA<br>and TINI LAM YUEN,<br><br>Defendants. | Crim. No. 07-225<br>Judge:  Reggie B. Walton |

**<u>PROPOSED ORDER</u>**

This matter having come before the Court on the ____ day of

_____, 2008, upon the joint motion to dismiss of Aitofele T.F. Sunia and Tini

Lam Yuen:

IT IS ORDERED that the motion is GRANTED for the reasons in the

opening and reply memoranda submitted by Mr. Sunia and Mr. Yuen;

IT IS FURTHER ORDERED that Count One is dismissed to the extent it

is based on acts that purportedly occurred before January 4, 2001;

IT IS FURTHER ORDERED that Count Two is dismissed for failure to

allege the "agent" element of 18 U.S.C. § 666 (i) as to Mr. Sunia, to the extent it is based

on acts before July 9, 2001, and (ii) as to Mr. Yuen, in its entirety;

IT IS FURTHER ORDERED that Counts Two, Three, and Four are dismissed as time-barred to the extent they are based on conduct that allegedly occurred before September 6, 2002; and

IT IS FURTHER ORDERED that Counts Five and Six are dismissed in their entirety because the Indictment fails to allege essential elements of 18 U.S.C. § 1505.

SIGNED on the _____ day of _____, 2008.

_____
REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE